IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:13-CV-74-FL

GEORGE G. MONROE,                    )
                                     )
            Plaintiff,               )
                                     )
        v.                           )        **MEMORANDUM AND**
                                     )        **RECOMMENDATION**
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

In this action, plaintiff George G. Monroe ("plaintiff" or, in context, "the claimant")

challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W.

Colvin ("Commissioner") denying his application for a period of disability and disability

insurance benefits ("DIB") and supplemental security income ("SSI") on the grounds that he is

not disabled.[1]  The case is before the court on the respective parties' motions for judgment on the

pleadings.  (D.E. 28, 33).  Each party filed a memorandum in support of its motion (D.E. 29, 35).

The motions were referred to the undersigned Magistrate Judge for a memorandum and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (*See* Docket Entry dated 11 Mar. 2014).

For the reasons set forth below, it will be recommended that the Commissioner's motion be

allowed, plaintiff's motion be denied, and the Commissioner's final decision be affirmed.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same.
The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those
relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

# BACKGROUND

## I.      Case History

On 12 March 2010, an Administrative Law Judge ("ALJ") issued a decision denying plaintiff's claims for DIB and SSI benefits ("2010 decision").  Transcript of Proceedings ("Tr.") 120-28.  On 21 March 2011, the Appeals Council vacated the 2010 decision and remanded the case on a variety of grounds for the issuance of a new decision.  Tr. 167-69.  The Appeals Council further directed the ALJ to provide plaintiff with the opportunity for a hearing and take necessary action to complete the administrative record.  Tr. 169.  The Appeals Council also addressed new applications for DIB and SSI benefits filed by plaintiff filed on 7 May 2010, shortly after the 2010 decision was issued, concluding that its "action with respect to the current claims renders the subsequent claims duplicate" and directing the ALJ to "associate the claim files and issue a new decision on the associated claims."  Tr. 169.

In response to the remand order, an ALJ, different from the one who issued the 2010 decision, held a supplemental hearing on 29 November 2011, at which plaintiff and a vocational expert ("VE") testified.  Tr. 65-112.  On 7 February 2012, the ALJ issued a decision denying plaintiff's DIB and SSI claims ("2012 decision").  Tr. 11-23.  Plaintiff timely requested review by the Appeals Council.  Tr. 6-7.  On 20 January 2013, the Appeals Council admitted additional evidence, namely, a pro se letter from plaintiff (Tr. 431-32), but denied the request for review (Tr. 1-4).  At that time, the 2012 decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.  Plaintiff commenced this proceeding for judicial review on 22 April 2013, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  (*See In Forma Pauperis* Mot. (D.E. 1), Order Allowing Mot. (D.E. 4), Compl. (D.E. 6)).

## II.     Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. § 1382c(a)(3)(B).  The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§ 404.1509 for DIB and § 416.909 for SSI], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] ["listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

III.    **Findings of the ALJ**

Plaintiff was 27 years old on the alleged onset date of disability and 32 years old on the date of the administrative hearing. Tr. 20 ¶ 7, 74. The ALJ found that he has at least a high school education (Tr. 21 ¶ 7) and past relevant work as a hand packer, dishwasher, demolition laborer, mentally handicapped CBS tech, shipping and receiving trucker, tagger, and sanitation worker (Tr. 21 ¶ 6).

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. Tr. 13 ¶ 2. At step two, the ALJ found that plaintiff had the

following medically determinable impairments that were severe within the meaning of the Regulations: sleep apnea, narcolepsy, myalgias, uveitis, anxiety, and mood disorder. Tr. 14 ¶ 3. At step three, the ALJ found that plaintiff's impairments did not meet or medically equal any of the listings. Tr. 14-16 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform light work—that is, to lift and carry up to 20 pounds occasionally and 10 pounds frequently, and to stand, walk, and sit for 6 hours in an 8-hour day.[2] Tr. 16 ¶ 5; *see* 20 C.F.R. §§ 404.1567(b), 416.967(b). He further found that plaintiff was subject to the following limitations:

> [H]e should climb stairs or ramps occasionally. The claimant should never climb ropes or ladders. He is limited to occasional bending, balancing, stooping, crawling, kneeling, or crouching. The claimant should avoid hazardous machinery and concentrated exposure to fumes. [He] is restricted to work in a well-lit environment. Lastly, the claimant is limited to simple, routine, and repetitive tasks ["SRRTs"].

Tr. 16 ¶ 5.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was not capable of performing his past relevant work. Tr. 21 ¶ 6. At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of cashier, sales attendant, and cafeteria attendant. Tr. 22 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled. Tr. 22 ¶ 11.

## IV.    Standard of Review

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence

---

[2] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," http://www.oalj.dol.gov/libdot.htm (last visited 7 Aug. 2014). "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. §§ 404.1567, 416.967.

in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## I. Overview of Plaintiff's Contentions

Plaintiff contends that the ALJ erred by: (1) failing to give appropriate weight to findings made by the ALJ in the 2010 decision; (2) finding that plaintiff did not meet or medically equal the listings for various mental impairments; (3) failing to properly consider his impairments of narcolepsy with cataplexy, memory deficits, and depression; (4) failing to adequately consider the opinions and findings of his treating and examining physicians; (5) improperly assessing his credibility; and (6) failing to propose an appropriate hypothetical to the VE. The court will address each contention separately.

## II. ALJ's Findings in the 2010 Decision

Plaintiff first contends that the ALJ failed to consider and give appropriate weight to the findings contained the 2010 decision regarding plaintiff's severe impairments, citing the Fourth Circuit's decision in *Albright v. Comm'r of Social Security*, 174 F.3d 473 (4th Cir. 1999). Specifically, he asserts that the impairments found to be severe in the 2010 decision—namely arthritis, back pain, shortness of breath, blackouts, eye pain, anxiety, and depression (Tr. 122)— are "nowhere mentioned in the [2012 decision] . . . ." (Pl.'s Mem. 13). The court finds plaintiff's argument to be wholly without merit.

As an initial matter, plaintiff's is plainly wrong that the ALJ did not reference in his decision the impairments found to be severe in the 2010 decision. In fact, several of the severe impairments included in the 2012 decision are the same or substantially the same as those found to be severe in the 2010 decision. Both decisions found plaintiff to have the severe impairment of anxiety. Also, depression, found to be a severe impairment in the 2010 decision, is a type of mood disorder, which was found to be severe in the 2012 decision. *See, e.g.,* Listing 12.04 for

Affective Disorders (characterizing this class of disorders as "disturbance[s] of mood" and defining "mood" as "prolonged emotion that colors the whole psychic life; it generally involves either *depression* or elation") (emphasis added). Further, while the 2010 decision lists "eye pain," the record clearly indicates that this symptom was a result of the uveitis[3] found as a severe impairment in the 2012 decision. *See, e.g.,* Tr. 572 (noting plaintiff's eye irritation resulting in diagnosis of uveitis); Tr. 629 (plaintiff complains of watery, burning, and itching in his eyes during ophthalmology examination for uveitis).

While the remaining severe impairments from the 2010 decision of shortness of breath, arthritis, back pain, and blackouts were not expressly listed as severe impairments in the 2012 decision, they are all discussed in some form at later steps in the sequential evaluation process. Regarding shortness of breath, the ALJ discussed in detail his reasons for finding that plaintiff's sarcoidosis[4] and asthma, two of the suspected causes of plaintiff's shortness of breath, are not severe impairments at step two (Tr. 14 ¶ 3) and reviewed the evidence of plaintiff's "history of respiratory problems" in evaluating plaintiff's RFC at step four (Tr. 17 ¶ 5).

As for arthritis, the ALJ discussed the evidence of joint pain in plaintiff's ankles, knees, and elbows. Tr. 18 ¶ 5. The ALJ also specifically referenced myalgia in plaintiff's thoracic spine—*i.e.*, back pain—and stated expressly that "claimant's medical history, including several back injuries and procedures, has been taken into account in determining [plaintiff's] RFC." Tr. 20-21 ¶ 5. Finally, with respect to "blackouts," the medical record does not contain evidence indicating that a definitive cause of these alleged episodes was identified. Rather, plaintiff's

---

[3] Uveitis is "swelling and irritation of the uvea, the middle layer of the eye." Def. of "Uveitis," Medline Plus, U.S. Nat'l Library of Medicine, http://www nlm nih.gov/medlineplus/ency/article/001005.htm (last visited 7 Aug. 2014).

[4] Sarcoidosis is an inflammatory disease in which granulomas (clusters of immune cells) form in certain organs of the body—primarily the lymph nodes, lungs, liver, eyes, skin, or other tissues. *See* Def. of "Sarcoidosis," Medline Plus, U.S. Nat'l Library of Medicine, http://www nlm nih.gov/medlineplus/ency/article/000076 htm (last visited 7 Aug. 2014). While the disease can affect any organ of the body, it most commonly affects the lungs. *Id.*

treating and examining providers, as well as plaintiff himself, indicated the suspected possible causes to be plaintiff's narcolepsy and sleep apnea (Tr. 70, 552, 837), cardiac symptoms related to plaintiff's sarcoidosis (Tr. 552), and anxiety (Tr. 93), all of which were discussed in the 2012 decision.[5] Thus, contrary to plaintiff's contention, the ALJ not only "mentioned," but thoroughly discussed each of the severe impairments found in the 2010 decision.

Nevertheless, plaintiff's contention that *Albright* required the ALJ to consider and give appropriate weight to findings contained in the 2010 decision is misguided. *Albright* addressed the extent to which the Social Security Administration ("SSA") is required to consider the findings in a prior final decision of the Commissioner in determining disability in a subsequent application involving an unadjudicated time period. *Albright*, 174 F.3d at 477-78 (explaining that the justification for this requirement was that "[t]o have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large—that *final agency adjudications* should carry considerable weight" (emphasis added)). Further, as explained in the SSA's Acquiescence Ruling 00-1(4), which interpreted *Albright*, the requirement "applies only to a finding of a claimant's [RFC] or other finding required at a step in the sequential evaluation process for determining disability . . . which was made in a *final decision by an ALJ or the Appeals Council* on a prior disability claim." Soc. Sec. Acquiescence Ruling 00-1(4), 65 Fed. Reg. 1936, 1938, 2000 WL 17162 (12 Jan. 2000) (emphasis added).

Here, plaintiff is asserting that the ALJ was required to consider not the findings in a prior *final* decision, but rather the findings in a decision that was *vacated* by the Appeals Council. As such, *Albright* has no application in this case, and this ground for challenging the ALJ's decision should be rejected. The court further notes that to the extent that plaintiff's

---

[5] While "partial complex" or "absence" seizures were explored as one possible cause for the alleged blackouts (Tr. 613, 676, 677, 680, 726, 729), neurological testing showed no evidence of seizures (Tr. 747, 729).

remaining challenges to the ALJ's decision are based on the argument that the findings of the 2010 decision were not given adequate weight, those arguments are also found to be without merit and will not be addressed further.

### III.   ALJ's Determination regarding Listings 12.04, 12.05, 12.06, and 12.07

Plaintiff next challenges the ALJ's determination that his impairments did not meet or medically equal the listings for affective disorders (Listing 12.04), mental retardation (Listing 12.05), anxiety related disorders (Listing 12.06), and somatoform disorders (Listing 12.07).  The sole argument that plaintiff makes in support of this contention is that the ALJ's listing determinations are "not supported by substantial evidence and [are] based on incorrect legal standard" because he "disregard[ed] or [failed to] consider[ ] the medical evidence from [his] treating and examining physician."  (Pl.'s Mem. 11).  Plaintiff provides no further explanation as to how the ALJ's determinations with respect to these listings were erroneous, nor does plaintiff specifically identify the "treating and examining physician" to whom he refers.  Because each of the referenced listings involves mental impairments, the court presumes that plaintiff is referring to a physician or provider who treated or examined him for mental health impairments.  The court finds plaintiff's argument, such as it is, to be baseless.

First, with respect to any examining mental health providers, plaintiff's assertion is factually erroneous.  Tr. 19-20 ¶ 5.  In discussing whether plaintiff met the "B criteria"[6] for Listings 12.04, 12.06, and 12.07, the ALJ expressly referenced (Tr. 15 ¶ 4) the consultative

---

[6] The "B criteria" for each of these listings require that the impairment result in at least two of the following:

1.   Marked restriction of activities of daily living; or
2.   Marked difficulties in maintaining social functioning; or
3.   Marked difficulties in maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

Listings 12.04B, 12.06B, and 12.07B.

examination reports of psychologist Henry William Link, Ph.D. and licensed psychological associate Ashely L. Booth, M.A. (Ex. 11F at Tr. 553-58) and psychiatrist Morton Meltzer, M.D. (Ex. 32F at Tr. 836-40). Specifically, in concluding that plaintiff had only mild restrictions in activities of daily living, the ALJ noted plaintiff's representation to Dr. Link that he did his own cooking, shopping, and bill paying. Tr. 15 ¶ 4. In his finding that plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, the ALJ expressly referenced Dr. Meltzer's opinion that plaintiff was able to sustain attention sufficiently to perform simple, repetitive tasks. Tr. 15 ¶ 4. In addition to these express references to the reports of these examining providers at step three, the ALJ discussed them in further detail in his subsequent RFC analysis and explained the weight he gave to the findings in each report. Tr. 19-20 ¶ 5. Accordingly, plaintiff's assertion that the ALJ disregarded or did not consider the records of examining mental health providers at step three is without basis.

Regarding the ALJ's consideration of the records of plaintiff's treating mental health providers, the ALJ did not expressly discuss these records at step three. However, the fact that the reasons underlying an ALJ's listing determination are not all set out at step three of the sequential analysis does not constitute legal error where the decision read as a whole makes them clear. *See, e.g., Smith v. Astrue*, No. 11-1574, 2011 WL 6188731, at *1 (4th Cir. 14 Dec. 2011); *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH, 2012 WL 3304107, at *5 (D.S.C. 25 Jul. 2012) ("This sort of deconstruction of the ALJ's decision[ ] is not useful. The ALJ's decision must be read as a whole."), *report and recomm. adopted by* 2012 WL 3308108, at *1 (13 Aug. 2012); *Finley v. Astrue*, No. 5:08-CV-209-D(l), 2009 WL 2489264, at *5 ("[T]he ALJ's decision may appropriately be read 'as a whole.'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3rd Cir. 2004))), *mem. and recomm. accepted by* 2009 WL 2489264, at *1 (E.D.N.C. 13 Aug. 2009).

Here, in his RFC analysis, the ALJ discussed the records of every mental health provider that treated plaintiff. Tr. 18-19 ¶ 5. These providers include: Native Angels Home Care Agency ("Native Angels"), which treated plaintiff from July 2007 to September 2007 (Ex. 2F at Tr. 438-60); Southeastern Regional Medical Center ("Southeastern"), which treated plaintiff after his voluntary admission for psychological problems on 28 September 2008 (Ex. 27F at Tr. 722-78[7]); and Asher Mental Health, which treated plaintiff from January 2009 to June 2011 (Ex. 29F at Tr. 806-15; Ex. 36F[8] at Tr. 869-71). The ALJ's discussion of these records further clarifies the reasons underlying the ALJ's B criteria findings at step three. For example, the ALJ notes (Tr. 18 ¶ 5) plaintiff's statement to psychiatrist Theresa Bullard, M.D. at Native Angels that he was having trouble focusing (Tr. 448) and his complaints of confusion and memory loss during his involuntary admission at Southeastern (Tr. 723, 725), which are pertinent to the ALJ's finding at step three that plaintiff had moderate difficulties in maintaining concentration, persistence, or pace (Tr. 15 ¶ 4). The ALJ also notes that upon discharge from Southeastern, plaintiff's "global assessment of functioning (GAF) score was 75-80, which indicated no more than a slight impairment in social or occupational functioning." Tr. 19 ¶ 5. This evidence is directly relevant to and supportive of the ALJ's finding at step three that plaintiff had only mild difficulties in social functioning. Tr. 15 ¶ 4.

For the foregoing reasons, the court concludes that plaintiff's argument that the ALJ disregarded or failed to consider the records of his treating and examining mental health providers at step three is without merit. It should accordingly be rejected.

---

[7] A duplicate but incomplete set of these records also appears at Tr. 671-91.

[8] Although the ALJ did not specifically reference Ex. 36, the records in this exhibit are only a more complete version of the therapy sessions log included in Ex. 29F at Tr. 814-15, which the ALJ did reference. The only new information provided by Ex. 36 is the additional dates on which plaintiff attended therapy sessions. Tr. 869-71.

IV.    **ALJ's Consideration of Plaintiff's Narcolepsy with Cataplexy, Memory Deficits, and Depression**

A.    **Narcolepsy with Cataplexy**

Plaintiff next asserts that the ALJ failed to find that plaintiff's narcolepsy[9] with cataplexy[10] was a severe impairment and failed to account for this impairment in formulating plaintiff's RFC.    As an initial matter, the ALJ expressly found plaintiff to have the severe impairment of narcolepsy. Tr. 14 ¶ 3.    Accordingly, the court presumes that plaintiff's argument is that the ALJ failed to find that plaintiff's alleged cataplexy, one of the symptoms of narcolepsy, was a severe impairment distinct from the other symptoms associated with narcolepsy.

Plaintiff asserts that the ALJ failed to adequately consider the diagnosis of narcolepsy with cataplexy on 1 April 2008[11] by Dr. Somnath Naik, M.D., who treated plaintiff between 10 January 2008 and 7 April 2008.    Tr. 607-19.    However, a medical diagnosis is not the polestar of disability determinations, but rather the impact of a medical impairment on an individual's functional abilities.    *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (holding that the

---

[9] "Narcolepsy" is "[a] sleep disorder that usually appears in young adulthood, consisting of recurring episodes of sleep during the day and often disrupted nocturnal sleep; frequently accompanied by cataplexy, sleep paralysis, and hypnagogic hallucinations; a genetically determined disease."    Stedman's Medical Dictionary, entry for "Narcolepsy" (27th ed. 2003).

[10] "Cataplexy" is "[a] transient attack of extreme generalized weakness, often precipitated by an emotional response, such as surprise, fear, or anger; one component of the narcolepsy quadrad."    Stedman's Medical Dictionary, entry for "Cataplexy" (27th ed. 2003).    During these attacks, which occur when the person is awake, "people remain fully conscious, a characteristic that distinguishes cataplexy from seizure disorders."    National Institute of Neurological Disorders and Stroke, "Narcolepsy Fact Sheet," http://www ninds nih.gov/disorders/narcolepsy/detail_narcolepsy.htm (last visited 7 Aug. 2014).    Notably, "[t]he most severe attacks result in a complete loss of tone in all voluntary muscles, leading to physical collapse during which individuals are unable to move, speak, or keep their eyes open." *Id.*

[11] Plaintiff's assertion that Dr. Naik made this diagnosis after his initial examination of plaintiff on 10 January 2008 is inaccurate. Following this examination, Dr. Naik opined only that plaintiff's symptoms could be caused by a number of conditions which, in addition to narcolepsy with cataplexy, included "atypical seizures or simply sleep attacks due to obstructive sleep apnea disorder" or "cardiac arrhythmias where heart blocking cardiac arrhythmias are common with sarcoidosis."    Tr. 552.    Dr. Naik then explained the further diagnostic testing he recommended to make a more definitive diagnosis. Tr. 552.

diagnosis of a condition, alone, is insufficient to prove disability, because there must also be "a showing of related functional loss"); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis . . . says nothing about the severity of the condition."). As described below, the ALJ's consideration of the impact of plaintiff's narcolepsy, including the associated symptom of cataplexy, is evident from his decision.

While the ALJ did not specifically reference cataplexy in his decision, an ALJ is not required to discuss every piece of evidence. *See, e.g., Doyle v. Colvin*, No. 7:12-CV-326-FL, 2014 WL 269027, at *10, *mem. and recomm. adopted by* 2014 WL 269027, at *1 (E.D.N.C. 23 Jan. 2014). Here, it is clear that the ALJ thoroughly considered and discussed all of the records that relate to plaintiff's narcolepsy, including those that referenced cataplexy. He found as follows:[12]

> In January 2008, [claimant] complained of excessive daytime sleepiness. At that time, the claimant reported having a history of sleep apnea and narcolepsy. . . . At that time, sleep testing showed evidence of moderate obstructive sleep apnea and periodic limb disorder. He was then diagnosed with mild obstructive apnea disorder with excessive daytime sleepiness with symptoms of narcolepsy. One month later, a sleep study indicated that the claimant had mildly reduced sleep efficiency with significantly decreased stage, mildly reduced REM sleep. The claimant's treating physician, then recommended treating the claimant's condition with a continuous positive airway pressure machine (CPAP) (Ex.18F). From that point forward, his conditions were controlled with conservative treatment. In September 2008, the claimant underwent electroencephalography, after complaining of confusion and narcolepsy. The study yielded normal results. [Ex. 27F] Since then, the claimant has not reported any exacerbations of [his] condition. At a consultative examination in December 2010, he reported that he continued to use a CPAP machine. . . . He was then diagnosed with a history of sleep apnea and narcolepsy (Ex.33F). The claimant has not reported any exacerbations of his condition, since then. The undersigned considered the claimant's subjective complaints and the objective evidence in determining the [RFC].

---

[12] Because both narcolepsy and sleep apnea were identified as possible causes of plaintiff's excessive daytime sleepiness, the ALJ understandably addresses them together.

Tr. 17 ¶ 5. Substantial evidence supports the ALJ's assessment, among it the evidence he cites.[13]

Moreover, it is apparent from the record why the ALJ did not find plaintiff's allegations of cataplexy worthy of discussion. In fact, plaintiff has not directed the court to the medical records that purportedly indicate he was experiencing cataplexy, and the court's review of the record reveals that he complained of this symptom on only one occasion, 1 January 2008. Tr. 551. On that date, according to Dr. Naik's records, plaintiff complained to him of "mild generalized weakness as if he is going to fall, though he was conscious. These episodes occurred when he was excited or laughing, which is classic for cataplexy . . . ." Tr. 551. Otherwise, plaintiff consistently described his narcolepsy symptoms as fatigue, nodding off or falling asleep, having blackouts, absence seizures,[14] and memory lapses. *See, e.g.*, Tr. 44, 50, 51, 94-95 (reporting blackout spells); Tr. 87 ("I drift off and just nod off and fall to sleep."); Tr. 93 ("I can be sitting and I'll just drift off, I'll just nod off."); Tr. 93 (describing absence seizures where he would "basically just freeze up, I can even be talking to somebody and I'll just freeze"); Tr. 554 (reporting absence seizures or blackouts); Tr. 573 (reporting syncopal (*i.e.*, fainting) episodes); Tr. 679 (describing blackout spells where "he completely [loses] consciousness or . . . may go to sleep"); Tr. 725 (describing blacking out while driving and having periods of times that he does not remember); Tr. 728 (noting that plaintiff described symptoms that he categorized as absence seizures); Tr. 846 (reporting that he "falls asleep easily if he is driving").

In addition, the ALJ heard testimony from plaintiff about the symptoms of his narcolepsy. At the hearing, plaintiff described his symptoms as follows:

---

[13] Plaintiff asserts in his memorandum that in reviewing Dr. Naik's opinion, the ALJ incorrectly stated that "no diagnostic tests were done." (Pl.'s Mem. 13). However, the statement to which plaintiff refers was made in the 2010 decision, which, as previously noted, was vacated by the Appeals Council. Tr. 126.

[14] "Absence seizures" are seizures "characterized by impaired awareness of interaction with, or memory of, ongoing events external or internal to the person; may comprise the following elements: mental confusion, diminished awareness of environment, inability to respond to internal or external stimuli, and amnesia." Stedman's Medical Dictionary, entry for "seizure" (27th ed. 2003).

> I was nodding off and falling asleep and stuff and I noticed that I was getting a little headaches and I noticed how my memory was lapsing and I started having the slight blackouts and everything and they, they ran a sleep study -- sent me to Dr. [Naik]. And that's when he ran the sleep studies and he diagnosed me with the, the narcolepsy and the sleep apnea.

Tr. 70-71. Plaintiff further testified that although his CPAP machine has helped, he "still [has] the sleep problems sometimes like I drift off and just nod off and fall to sleep." Tr. 87. When questioned about his narcolepsy symptoms by counsel, plaintiff testified as follows:

> It's pretty -- most times the fatigue is always extreme. I can say that the fatigue is usually pretty extreme. I do better sometimes when I can get a little more rest but I always have like you know like I said I work at the storehouse, I can be sitting and I'll just drift off, I'll just nod off. And as far as the seizures they stated them as absence seizures a while back. I basically just freeze up, I can even be talking to somebody and I'll just freeze. And I, I had to grow to notice it myself because you know if it's happening to you I didn't really notice it at first but for the most part that's, that's what I deal with the sleep because of these problems.

Tr. 93.

Thus, based on plaintiff's own reports of his symptoms, it does not appear that plaintiff's narcolepsy was characterized by the distinct symptom of cataplexy, during which an individual remains conscious, but rather by suddenly falling asleep or blacking out. In light of the limited evidence that plaintiff experienced symptoms of cataplexy, the ALJ's implicit determinations that cataplexy was not a severe impairment and that it did not need to be accounted for in the RFC were proper. Nevertheless, despite plaintiff's contention to the contrary, the ALJ did include non-exertional limitations in plaintiff's RFC accommodating the other symptoms of plaintiff's narcolepsy that would also address any cataplexy symptoms—namely, only occasional climbing of stairs or ramps, never climbing ropes or ladders, and avoiding hazardous machinery. Tr. 16 ¶ 5.

For the foregoing reasons, plaintiff's argument that the ALJ did not adequately evaluate any limitations caused by cataplexy symptoms should be rejected.

### B.  Memory Deficits

As with the symptom of cataplexy, plaintiff argues that the ALJ failed "to consider or even acknowledge" plaintiff's symptoms of memory loss in determining his severe impairments or his RFC.  (Pl.'s Mem. 12).  The only evidence he cites is the memory testing performed by state consultant examiner Dr. Link, which plaintiff contends "confirmed" his memory loss.  (Pl.'s Mem. 14).  Thus, plaintiff essentially contends that the ALJ did not consider the findings of Dr. Link.  This notion is plainly wrong.

As already discussed above, the ALJ specifically referenced Dr. Link's findings in assessing plaintiff's mental impairments at step three (Tr. 15 ¶ 4) and then discussed Dr. Link's report twice in determining plaintiff's RFC (Tr. 19-20 ¶ 5).  The ALJ first summarized Dr. Link's findings as follows:

> A mental status examination revealed that the claimant [had] an intermittent tension release leg jiggling.  He was then diagnosed with an anxiety disorder (not otherwise specified), mood disorder due to multiple physical problems, rule out hypochondriasis, and rule out alcohol abuse from prior history.  The claimant's GAF score, at that time, had improved to 55-65 indicating moderate or mild symptoms (Ex.11F).

Tr. 19 ¶ 5.  In later explaining the weight he gave to Dr. Link's findings, the ALJ further explained:

> The claimant's mental limitations were assessed at a consultative examination. The consultative examiner opined that the claimant was able to handle basic self-care operations at this point.  The claimant appeared marginally low, in terms of mastering basic directions or procedures reliably and safely.  Lastly, the claimant's ability to sustain attention, efforts, and constructive interpersonal relationships over time in goal-oriented activities was moderately low, at that point (Ex.11F).  The undersigned gives the consultative examiner's opinion limited weight.  The undersigned determined that the objective evidence or the claimant's treatment history did not support the consultative examiner's findings.

Tr. 19-20 ¶ 5.  While the ALJ did not specifically discuss the results of the memory test, this test was only one of several measures or assessments made by Dr. Link during the examination,

including assessment of plaintiff's abstract thinking, judgment, intellectual functioning, and ability to do mathematical calculations. Tr. 557. The ALJ's discussion of the report focused on, appropriately, Dr. Link's ultimate assessment of plaintiff's limitations based on the examination findings. Thus, plaintiff's argument that the ALJ did not consider the findings of Dr. Link regarding plaintiff's memory deficits is without merit.

Furthermore, the ALJ thoroughly considered the findings of psychological consultant examiner Dr. Meltzer (Tr. 20 ¶ 5), who also assessed, *inter alia*, plaintiff's memory (*see, e.g.,* Tr. 838 (Dr. Meltzer noting that plaintiff had "an adequate memory for recent and past events," was able to accurately recall multiple historical events and persons, and "could remember all three items I asked him to remember 10 minutes before")). In addition to referencing Dr. Metzler's findings at step three, as mentioned above, the ALJ discussed them in detail in assessing plaintiff's RFC. In particular, the ALJ again noted Dr. Metzler's conclusion that plaintiff "was able to understand, retain and follow instructions" such that he would be "able to sustain attention to perform simple, repetitive tasks." Tr. 20 ¶ 5 (citing Dr. Metzler's Rep. at Tr. 839).

The ALJ also considered the records of other providers that assessed plaintiff's memory. *See, e.g.*, Tr. 449 (treating psychiatrist's finding that plaintiff's "[c]ognition and memory are grossly intact"); Tr. 734 (treating neurologist's finding that plaintiff had "a good short-term and long-term memory"); Tr. 808, 812 (mental health practice admission assessment indicating that plaintiff did not complain of attention issues and finding that plaintiff exhibited no cognitive or memory problems). The court further notes that, despite plaintiff's complaint of being unable to retain information he reads (*see, e.g.,* Tr. 83, 838), upon request of the ALJ at the hearing, plaintiff was able to recite from memory a 34-word Bible verse (Tr. 84).

Not only did the ALJ thoroughly consider the medical evidence relating to plaintiff's alleged memory loss, he also limited plaintiff to SRRT's in the RFC (Tr. 16 ¶ 5), which would address, to some degree, any memory issues. Accordingly, plaintiff's challenge on this basis should be rejected.

### C. ALJ's Alleged Failure to Address Plaintiff's Depression in the RFC

Plaintiff also asserts summarily that the ALJ failed to include non-exertional limitations in plaintiff's RFC accounting for his severe impairment of depression. Plaintiff does not specify the limitations that he alleges were omitted or provide any supporting argument. The specific nature and basis of his contention are not otherwise apparent. Indeed, the ALJ specifically adopted the finding in the psychological evaluation report of Dr. Metzler that plaintiff was restricted to performing SRRT's (Tr. 20 ¶ 5), which was included as a limitation in plaintiff's RFC (Tr. 16 ¶ 5). Accordingly, the court finds plaintiff's unsupported contention to be groundless, and it should be rejected.

## VI. ALJ's Consideration of the Opinions of Plaintiff's Treating and Examining Physicians

The plaintiff next contends that the ALJ failed to properly consider the medical opinions of his treating and examining[15] physicians and failed to "give good reason for the weight or lack of weight" he gave to them. (Pl.'s Mem. 15). The court disagrees.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a

---

[15] In his argument, such that it is, plaintiff references only treating physicians and not non-treating physicians. Accordingly, the court will not address plaintiff's argument with respect to non-treating examining medical sources.

case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D. W.Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant."). The Regulations provide that opinions of treating physicians and psychologists on the nature and severity of impairments are to be accorded controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (2 July 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590.

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [*i.e.*, giving less weight to the opinion of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion."). Where there are multiple opinions from a single source, an ALJ does not necessarily have to discuss each opinion separately to make clear the weight given it and the underlying reasons. *See* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2.

While plaintiff provides a list of 13 providers with whom he contends he had an "established a longitudinal medical relationship," he otherwise fails to explain or even suggest how the ALJ erred in considering their respective medical opinions or even the basis for his contention that the ALJ gave the opinions less than controlling weight. (Pl.'s Mem. 15-16). Absent such an explanation, the court declines to do a wholesale evaluation of the manner in which the ALJ considered and weighed these records for all of these providers, to the extent that the court has not already done so above with respect to plaintiff's other challenges, and plaintiff has certainly not demonstrated any error in the ALJ's handling of this evidence. The court concludes that plaintiff's unsupported challenge to medical source opinion evidence is meritless, and, consequently, it should be rejected.

## VII. Assessment of Plaintiff's Credibility

The ALJ found plaintiff's allegations of his limitations to be less than fully credible. Tr. 19 ¶ 5. The court finds no error.

An ALJ's assessment of a claimant's credibility involves a two-step process. *Craig v. Chater*, 76 F.3d at 593-96; 20 C.F.R. §§ 404.1529(a)-(c), 416.929(a)-(c); SSR 96–7p, 1996 WL 374186, at *1 n.1; 2 (2 July 1996). First, the ALJ must determine whether plaintiff's medically documented impairments could cause plaintiff's alleged symptoms. SSR 96-7p, 1996 WL 374186, at *2. Next, the ALJ must evaluate the extent to which the claimant's statements concerning the intensity, persistence, or functionally limiting effects of the symptoms are consistent with the objective medical evidence and the other evidence of record. *See id.; see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (setting out factors in addition to objective medical evidence in evaluation of a claimant's pain and other symptoms). If the ALJ does not find plaintiff's statements to be credible, the ALJ must cite "specific reasons" for that finding that are

"supported by the evidence." SSR 96-7p, 1996 WL 374186, at *2, 4; *Jonson v. Colvin*, No. 12cvl742, 2013 WL 1314781, at *7 (W.D. Pa. 28 Mar. 2013) ("If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision."); *Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006).

In assessing plaintiff's allegations, the ALJ made the step-one finding that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 17 ¶ 5. At the second step of the credibility assessment, the ALJ found that plaintiff's allegations were "not fully credible" (Tr. 19 ¶ 5) and, specifically, that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment" (Tr. 17 ¶ 5).

The ALJ explained his ruling as follows:

> The claimant alleged that he was unable to work because of visual disturbances and sleep apnea. Although the claimant continues to experience visual disturbances, the record indicates that his condition has been controlled with conservative treatment. At the hearing, he testified that he has not experienced temporary blindness since the first episode. [Tr. 85] With respect to the claimant's sleep apnea, his condition is controlled. Moreover, the claimant's treating physician has consistently described the claimant's sleep apnea as mild or moderate (Ex.l8F). In addition, the record indicates that the claimant has complained of anxiety. However, the record also indicates that the claimant has been consistently diagnosed with hypochondria. Furthermore, the claimant testified that his anxiety no longer hindered him [Tr. 100]. As such, the undersigned finds that the claimant's allegations are not fully credible.

Tr. 19 ¶ 5. These findings by the ALJ are supported by substantial evidence of record, among it the evidence he cites. *See also* Tr. 518 (ophthalmologist's finding that plaintiff's uveitis was stable); Tr. 828 (normal eye exam); Tr. 839 (diagnosis of hypochondria).

The court concludes that the ALJ's determination of plaintiff's credibility was supported by substantial evidence and based on proper legal standards. This challenge to the ALJ's decision should accordingly be rejected.

## VII. Hypothetical Proposed to the VE

Finally, plaintiff asserts that the hypothetical proposed by the ALJ to the VE at the hearing did not include all of the limitations and restrictions resulting from plaintiff's impairments. Aside from this conclusory assertion, plaintiff provides no explanation as to how the hypothetical proposed was incorrect.

A hypothetical question is proper if it adequately reflects a claimant's RFC for which the ALJ had sufficient evidence. *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). The hypothetical the ALJ posed here meets this standard. It provided as follows:

> Now, if you would assume a hypothetical individual who has the same age, education and work experience as the claimant and has an RFC to perform light exertional work. This individual should only have occasional climbing of stairs or ramps, only occasional bending, balancing, stooping, crawling, kneeling or crouching. This individual should never climb ropes, ladders or scaffolds, this individual should avoid occupations with hazardous machinery and concentrated exposure to fumes. This individual would be limited to [SRRT's] and would need to work in a well lit environment. Could the hypothetical individual that I just described perform any of claimant's past work either as he performed it or as it's being performed [in] the national economy?

Tr. 107. As required, this hypothetical essentially restates the ALJ's RFC determination. As to those portions of the RFC that plaintiff has challenged, the court has concluded that they are supported by substantial evidence as previously discussed. Plaintiff's challenge to the ALJ's hypothetical to the VE is therefore meritless, and it should be rejected.

## CONCLUSION

After careful consideration of the ALJ's decision and the record in this case, the court concludes that the decision is supported by substantial evidence of record and based on proper legal standards. IT IS THEREFORE RECOMMENDED that the Commissioner's motion (D.E. 33) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 28) for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 21 August 2014 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 7th day of August 2014

James E. Gates
United States Magistrate Judge